52 F.3d 336
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Allan Edward WOODBRIDGE, Defendant-Appellant.
 No. 94-30213.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 6, 1995.
Decided April 13, 1995.
 
 IN PART, VACATED AND REMANDED IN PART.
 Before: SKOPIL, HALL, and WIGGINS, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Allan Edward Woodbridge appeals his conviction and sentence on twelve counts of knowingly possessing machineguns in violation of 18 U.S.C. Secs. 922(o) and 924(a)(2). We affirm Woodbridge's conviction, but remand for resentencing.
 
 I.
 
 3
 Woodbridge contends that the district court committed constitutional error in excluding various items of evidence. After conducting a de novo review of the record, we conclude that the court did not so err.
 
 
 4
 (a) The AR-15's
 
 
 5
 (i) Proffered testimony on "slam-firing" and manual manipulation
 
 
 6
 Woodbridge argues that the district court erred in excluding his evidence that the four AR-15 rifles charged in the indictment fired semiautomatically, thus preventing him from negating one element of the offense--i.e., possession of an automatic weapon. See 18 U.S.C. Sec. 922(o); 26 U.S.C. 5845(b). We disagree.
 
 
 7
 According to Charles Karwan, two of the AR-15's in the Government's videotape were "slam-firing." [CR 91, Karwan Affidavit] With respect to those two weapons, however, Karwan is careful to point out that "this type of 'slam-firing' firearm is not functioning in a reliable fashion and cannot be duplicated at will." [CR 91, Karwan Affidavit at 3] This statement made by Woodbridge's own expert severely undermines Woodbridge's allegation that all of the AR-15's were being deliberately manipulated.
 
 
 8
 Karwan also would have testified that the other two AR-15's shown in the Government's videotape were being deliberately manipulated to simulate automatic fire, but were actually firing in a semiautomatic fashion. An expert may only testify on a proper subject for expert testimony. United States v. Rahm, 993 F.2d 1405, 1409 (9th Cir.1993). The district court's view of the proffered testimony as an "improper subject" for expert testimony is revealed in its comment that "[t]he jury can very well tell [whether Silva was manipulating the weapons] on their own. They don't need somebody to tell them whether the trigger was pulled once or twice." [TR 202-03] See Rahm, 993 F.2d at 1413 ("Our 'proper subject' inquiry has generally focused upon whether the expert testimony improperly addresses matters within the understanding of the average juror.") We agree that Karwan's testimony was not a proper subject for expert testimony.[1]
 
 
 9
 Defendant's final argument with respect to the Government's videotape is that replaying it during jury deliberations outside the presence of the defendant placed undue emphasis on the tape's validity. We are persuaded that replaying the tape was harmless beyond a reasonable doubt.
 
 
 10
 (ii) Proffered testimony of Manning and Jassaud
 
 
 11
 The district court properly excluded the proffered testimony of Donald Manning and Detlaf Jassaud because that testimony was not relevant to the AR-15s' ability to fire automatically. Both witnesses would have testified that the rifles fired in semiautomatic mode. Additionally, defendant sought to introduce a video of one of the guns firing in a semiautomatic fashion. [TR 196] The Government does not disagree that each of the weapons can be made to fire semiautomatically as well as automatically, and even stipulated to that fact. [TR 197] Because there is not a shred of evidence in the record that the two modes of firing are mutually exclusive, the semiautomatic capability of the rifles does not tend to negate the capacity of the guns to fire automatically. Defendant had the opportunity to present witness testimony that the weapons were examined and found to be incapable of firing in an automatic mode, but did not do so.
 
 
 12
 (iii) BATF rulings
 
 
 13
 Woodbridge next contends that the district court made evidentiary rulings that prevented him from rebutting the Government's proof of a second element of the charged offense--i.e., "knowing" possession of a machinegun. See 18 U.S.C. Sec. 924(a)(2). Woodbridge sought to introduce Manning's testimony on the legality of Woodbridge's possession of the AR-15's under rulings made by the Bureau of Alcohol, Tobacco and Firearms ("BATF"). The district court properly excluded this testimony. It is "well settled" that the judge, and not an expert, instructs the jury on the law. United States v. Weitzenhoff, 35 F.3d 1275, 1287 (9th Cir.1993) (court's admission of expert testimony on contested issues of law in lieu of instructing the jury was manifestly erroneous).
 
 
 14
 Woodbridge also contends that the district court erred in excluding a BATF "ruling" indicating that AR-15 rifles containing M-16 parts are legal when possessed in conjunction with an uninstalled auto sear. The so-called "ruling" offered by defendant is a March 11, 1981, letter issued by the BATF to a Mr. T.F. LaFrance (the "LaFrance letter"). The district court properly excluded the letter. Because it was not addressed to Woodbridge and was not issued pursuant to the BATF's official rulemaking procedures[2], Woodbridge's alleged reliance upon it was ill-founded. Aside from Mr. Manning's inadmissible testimony, defendant presents no evidence that the LaFrance letter was actually an official ruling.
 
 
 15
 (b) The Stens
 
 
 16
 Woodbridge next contends that the Government was required to prove that the Sten tubes charged in the indictment were "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun." See 26 U.S.C. Sec. 5845(b). Defendant argues that he should therefore have been permitted to present Karwan's testimony on the possible innocent uses of the Sten tubes. The implication is that the Government was not entitled to rely on any other portion of section 5845(b) in proving its case.
 
 
 17
 By focusing exclusively on one portion of the machinegun definition, defendant ignores the fact that the Government presented overwhelming evidence to support its theory of the case--i.e., that the Sten tubes were machinegun "receivers" that could be used in conjunction with a Sten machinegun parts kit also found in Woodbridge's possession, to assemble a machinegun within the meaning of section 5845(b).[3] The exclusion of Karwan's testimony was proper.
 
 
 18
 (c) Thompson machinegun receivers
 
 
 19
 Woodbridge contends that because the Government had to prove that the Thompson submachinegun parts could be "readily restored" into a machinegun pursuant to section 5845(b), the court erred in excluding Karwan's testimony that the parts could not be reassembled "without considerable welding, cutting and milling," and Schefsky's testimony that the Government's tests on the Thompson upper receivers were insufficient to determine whether those parts were automatic weapons. We disagree.
 
 
 20
 The district court requested an offer of proof as to the anticipated testimony of defendant's witnesses. [TR 192] Our reading of the transcript reveals that defendant's counsel only offered Karwan's proposed testimony on the AR-15's. [TR 215] Thus, defendant cannot accurately say that the court erroneously excluded testimony that the Thompson parts could not be "readily restored" into a machinegun. Similarly, defendant's counsel only informed the court that Schefsky would testify about the results of his microscopic examination of the AR-15's. [TR 199]
 
 
 21
 (d) Agent Silva's bias
 
 
 22
 Defendant next attacks the district court's in limine ruling excluding evidence that Woodbridge was acquitted of machinegun possession in a state criminal proceeding and that he brought a civil suit against Silva in federal court that was dismissed.[4] Defendant contends that these proceedings are relevant to show Silva's bias.
 
 
 23
 The district court's ruling was proper. Because Silva gave prior sworn testimony during Woodbridge's state trial, any inconsistencies could have been brought out on cross-examination had defense counsel chosen to do so.
 
 
 24
 Defendant also sought to introduce the testimony of a Mr. McCann that "he heard Agent Silva testify that he has convicted at least 20 men by slam firing." [TR 217-18] Opening Brief at 9. Such testimony was properly excluded as inadmissible hearsay. Silva was available at trial and was cross-examined by defendant's counsel. As noted by the district court, counsel did not explore Silva's credibility and alleged bias on cross-examination.
 
 
 25
 (e) Evidence on auto sears
 
 
 26
 Defendant next contends that the district court erred in excluding testimony from two of defendant's professors that Woodbridge made the four auto sears found in his possession in 1978 while a gunsmithing student at Green River College. The significance of this testimony, defendant argues, is that auto sears manufactured before 1981 are not illegal. Opening Brief at 18.
 
 
 27
 The parties present contradicting arguments concerning the legality of an pre-1981 auto sear possessed in conjunction with an AR-15 equipped with M-16 parts. Neither party cites any cases, official BATF rulings or statutes to support their position. It is unnecessary for us to resolve the issue, however, because there was undisputed testimony that the weapons fired in automatic mode even without the placement of an auto sear. Therefore, the district court did not err in excluding the proffered evidence.
 
 II.
 
 28
 Woodbridge next attacks the district court's instructions on the knowledge element of the machinegun offenses. We conclude that the court's instructions were proper.
 
 
 29
 The Supreme Court's decision in Staples v. United States requires the Government to prove that the defendant "knew of the features of his AR-15 that brought it within the scope of the Act." Staples v. United States, 114 S.Ct. 1793, 1802 (1994). The district court in the present case instructed the jury that the Government must prove beyond a reasonable doubt "[f]irst that the defendant possessed a machinegun; [s]econd, that he did so knowingly; and [t]hird, that he did so on or about the date charged in that Count." Next, the court read the statutory definition of "machinegun" to the jury verbatim. Finally, the court instructed the jury that "[a]n act is done knowingly if the defendant is aware of the act and does not act or fail to act through ignorance, mistake, or accident. The government is not required to prove that the defendant knew that his acts or omissions were unlawful." [SER 33]
 
 
 30
 Defendant incorrectly contends that the district court undermined the knowledge requirement by stating that the Government need not prove that the defendant "knew that his acts or omissions were unlawful." Taken as a whole, the instructions properly stated that the defendant must have knowingly possessed an item falling within the statutory definition of machinegun--i.e., an item possessing the "features" of a machinegun. Defendant's suggestion that he must also have known of the illegality of his conduct is nothing more than an argument that his ignorance of the law should have excused him from liability. It is clear, however, that "[t]he mens rea presumption requires knowledge only of the facts that make the defendant's conduct illegal, lest it conflict with the related presumption, 'deeply rooted in the American legal system,' that, ordinarily, 'ignorance of the law or a mistake of law is no defense to criminal prosecution.' " Staples, 114 S.Ct. 1806, n. 3 (Ginsburg, J., concurring).
 
 III.
 
 31
 Woodbridge contends that there was insufficient evidence that he knew he possessed machineguns. We disagree. There was sufficient evidence for a reasonable jury to find that defendant knew the AR-15's could be fired automatically. In brief, the prosecution established that defendant was a gunsmith and a federally licensed firearms manufacturer who had fired machineguns in the past. [TR 267, 278] One of the charged weapons was a loaded custom-made gun that bore his nickname and the name of his gun shop. Further circumstantial evidence is the fact that each weapon had an external selector switch that rotated into the full automatic position; one of the guns was found with its fire selector in that position. Given Woodbridge's professional and educational background, it would not be unreasonable for a jury to infer that he knew the weapons could be fired in automatic mode.[5] Similarly, a rational jury could have inferred, based on Woodbridge's expertise, that he knew the Sten and Thompson receivers fell within the statutory definition of "machinegun."
 
 IV.
 
 32
 Defendant contends that the district court erred in failing to hold an evidentiary hearing before sentencing him. Federal Rule of Criminal Procedure 32(c)(3)(A) expressly vests a district court with discretion to hold an evidentiary hearing. U.S.S.G. Sec. 6A1.3(a) provides that "[w]hen any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor." The Commentary to section 6A1.3 indicates that written statements of counsel and witness affidavits may be adequate under many circumstances. Here, defense counsel submitted witness affidavits. [CR 91, 92; ER 15, 46] Counsel informed the court that he preferred to introduce his evidence through live testimony, but that the witnesses would not say anything that was not in the declarations. [ER 234] We are persuaded that the district court did not err in failing to hold an evidentiary hearing.
 
 
 33
 (a) Abuse of position of trust/special skill
 
 
 34
 In the case at bar, defense counsel alleged factual inaccuracies, challenging, inter alia, the PSR's contention that Woodbridge abused his trust or used a special skill in committing the possession offenses. The district court did not make separate written findings on this point, but did adopt the PSR's underlying factual findings. [Sentencing Tr. at 19] Generally, "where the district court has received the PSR and the defendant's objections to it, allowed argument to be made and then adopted the PSR, no more is required under Rule 32(c)(3)(D)." United States v. Williams, 41 F.3d 496, 498 (9th Cir.1994). It is "well settled," however, that the court may not adopt "conclusory statements unsupported by the facts or the Guidelines." Id. The district court's adoption of the PSR's conclusion that Woodbridge abused his trust or used a special skill in committing the possession offense was clearly erroneous.
 
 
 35
 The Government's argument on this point is that firearms licensees are afforded a position of public trust and that the possession of unregistered firearms constitutes an abuse of that trust. Finally, the Government argues that Woodbridge's expertise facilitated the possession offenses.
 
 
 36
 U.S.S.G. 3B1.3 "was intended to punish those who abuse their special skills by using them to facilitate criminal activity...." United States v. Mainard, 5 F.3d 404, 406 (9th Cir.1993). Similarly, the position of trust "must have contributed in some substantial way to facilitate the crime and not merely have provided an opportunity that could as easily have been afforded to other persons." United States v. Cuff, 999 F.2d 1396, 1397 (9th Cir.1993) (emphasis added) With respect to abuse of position, "the critical inquiry is the extent to which the position provides the freedom to commit a difficult-to-detect wrong." Id.
 
 
 37
 In the case at bar, there is nothing in the record to suggest that Woodbridge's possession offenses were "significantly facilitated" either by his expertise or his status as a firearms licensee. The Government presented no evidence that Woodbridge actually manufactured or assembled the charged weapons. Further, the record contains no indication that Woodbridge's license enabled him in some way to acquire the illegal weapons and parts.[6] Thus, the district court erred in enhancing Woodbridge's sentence under Sec. 3B1.3. We vacate Woodbridge's sentence and remand for resentencing on this point only.
 
 
 38
 (b) Refusal to apply sport/collector reduction
 
 
 39
 Pursuant to U.S.S.G. Sec. 2K2.2(b)(3) (currently section 2K2.1(b)(2)), defendant sought a six-point reduction for possession of a firearm solely for sport or collection. The Application Notes to section 2K2.1(b)(1) make clear that "intended lawful use" of an illegal weapon must be determined by the surrounding circumstances, including "the number and type of firearms ... and ammunition, the location and circumstances of possession, the nature of the defendant's criminal history ... and the extent to which possession was restricted by local law." U.S.S.G. Sec. 2K2.1(b)(1), comment. (n. 2).
 
 
 40
 Local law, at the time of Woodbridge's offense, provided that "it is unlawful for any person to ... have in possession or under control, any machinegun, or any part thereof capable of use or assembling or repairing any machinegun." RCW Sec. 9.41.190. See also United States v. Pope, 871 F.2d 506, 508-509 (5th Cir.1989), cited with approval in United States v. James, 957 F.2d 677 (9th Cir.1992) ("[O]nly a lawful collection of guns can be considered as a mitigating factor under Sec. 2k2.2(b)(3)" but collector reduction might apply where legitimate gun collector possessed lawful collection of guns, but one of the firearms had an altered serial number.) In addition, the "location and circumstances of [Woodbridge's] possession were inconsistent with a sporting use. In brief, two of the AR-15's and the Sten and Thompson receivers were found at Woodbridge's place of business. The receivers were paired and wrapped in paper. Also inconsistent with a sporting use is the fact that the "Big Al" gun was found loaded in Woodbridge's bedroom, suggesting a personal protection use. See United States v. Uzelac, 921 F.2d 204, 206 (9th Cir.1990) ("The shotgun was kept fully loaded while it was on the display rack, a condition perhaps more consistent with use for personal protection than use as a hunting weapon.") See also United States v. Lam, 20 F.3d 999, 1002 (9th Cir.1994) (emphasis added) ("[W]e do see a good deal of logic in the Commission's decision to limit the reduction to those who hold a weapon for lawful sporting or collection purposes. Neither of those purposes encompasses the killing or maiming of human beings, but personal protection surely does. Moreover, a personal protection reduction would open a great hole in the Guidelines.") The district court did not err in holding that Woodbridge was not entitled to a reduction for sporting or collection purposes.
 
 
 41
 (c) Silencer enhancement
 
 
 42
 Defendant contends that this court should apply the current version of U.S.S.G. Sec. 2K2.1, which contains no provision for a silencer enhancement. We disagree. Normally, a district court is to apply the version of the Sentencing Guidelines and policy statements in effect on the date of sentencing except where amended versions of the Guidelines are ex post facto (i.e., disadvantage the defendant). In such cases, a defendant is to be sentenced in accordance with the guidelines in effect at the time of the offense. United States v. Schram, 9 F.3d 741, 742 (9th Cir.1993). In the case at bar, the PSR recommended that the 1988 Guidelines in effect on the date of Woodbridge's offense apply because they were "more favorable to the defendant than the current edition of the guidelines manual." See PSR at 2. This indeed appears to have been the case. Under the 1988 Guidelines, Woodbridge's base offense level was 12. The 1993 Guidelines specify a base offense level of 18. See 2K2.1(a)(5) (Nov. 1993). Apparently agreeing with the PSR's assessment, defendant made no objection to the court's use of the 1988 Guidelines at his sentencing hearing and even stated in his Objections to the PSR that he agreed with the PSR's "reliance on the 1988 guidelines provision." [CR 95]
 
 
 43
 On appeal, defendant asks us to apply certain provisions of the 1993 Guidelines in effect at the time of sentencing. This request contravenes the Ninth Circuit's pronouncement that sentences should "be determined under one set of Guidelines rather than applying the Guidelines piecemeal." United States v. Warren, 980 F.2d 1300, 1306 (9th Cir.1992). See also U.S.S.G. Sec. 1B1.11 (Nov.1993). For this reason, defendant is not entitled to rely on the fact that current Guidelines contain no enhancement for a silencer.
 
 
 44
 The district court did not err in using the silencer provision to enhance Woodbridge's sentence under U.S.S.G. Sec. 2K2.2(b)(2). Possession of the silencer in conjunction with the Palmetto firearm was relevant conduct appropriate for consideration by the district court. U.S.S.G. Sec. 1B1.3.
 
 
 45
 (d) Multi-count grouping guideline
 
 
 46
 Defendant next contends that the court erred in enhancing his sentence by breaking the twelve counts into two separate groups of closely related offenses: (1) Counts I-III and Counts V-XII and (2) Count IV. Count IV was separated from the other counts because the Palmetto was equipped with a silencer. Defendant contends that the twelve counts should have been treated as a single group pursuant to U.S.S.G. Sec. 3D1.2, which would have allowed him to be sentenced for one aggregate offense with one offense level.
 
 
 47
 Under the 1988 Guidelines, offenses covered by U.S.S.G. Sec. 2K2.2 (currently 2K2.1) were not listed in Sec. 3D1.2 as offenses subject to single group treatment. Section 3D1.2 did, however, make clear that if an offense was not listed, the sentencing court could use its discretion to afford a defendant single group treatment. Such a decision was to be made on a case-by-case basis, taking into account whether the counts involved "substantially the same harm."
 
 
 48
 The version of the Guidelines in effect at the time of defendant's sentencing differs from the 1988 version in that it lists section 2K2.1 as an offense category subject to grouping. Defendant contends that because the current Application Notes clarify that all section 2K2.1 offenses should be grouped together, grouping treatment should have applied retroactively. See United States v. Garcia-Cruz, 40 F.3d 986 (9th Cir.1994) (amendments to the Sentencing Guidelines which are merely "clarifying" as opposed to "substantive" may be given retroactive effect). Defendant is incorrect. U.S.S.G. Appendix C explicitly denotes those amendments meant to have only a clarifying effect. Appendix C contains no indication that the inclusion of section 2K2.1 in section 3D1.2 was intended to have only a clarifying effect. In fact, the Appendix reveals that section 2K2.2 was included in section 3D1.2 to "make[ ] the listing of offenses in Sec. 3D1.2(d) more comprehensive." U.S.S.G. Appendix C at 194, note 349 (Nov. 1990). Thus, the district court had the discretion to treat Count IV as a separate group.
 
 
 49
 The district court did not err in separating Count IV from the other counts based on the fact that the Palmetto had a silencer. See United States v. Bakhtiari, 913 F.2d 1053 (2d Cir.1990) (noting that possession of semiautomatic pistol and possession of silencer do not involve "substantially the same harm" because silencer transforms an unmuffled gun into a far more threatening weapon); United States v. Pope, 871 F.2d 506, 509 (5th Cir.1989) (same). Further, U.S.S.G. Sec. 3D1.2(c) provides that single group treatment is appropriate "[w]hen one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts." Here, the Palmetto's silencer was not treated as a specific offense characteristic with respect to the other eleven counts.
 
 CONCLUSION
 
 50
 We affirm Woodbridge's conviction, but vacate his sentence and remand for resentencing consistent with this disposition.
 
 
 51
 AFFIRMED IN PART; VACATED AND REMANDED IN PART.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Additionally, by counsel's own admission, the purpose of Karwan's testimony was to impugn Silva's credibility. [TR 209, 211] Expert testimony introduced "to bolster or impugn the credibility of a witness is properly excluded." Id. See also United States v. Komisaruk, 885 F.2d 490, 494 (9th Cir.1989); United States v. Binder, 769 F.2d 595, 602 (9th Cir.1985). Defendant could have attempted to undermine Silva's credibility through cross-examination, but, for some reason, chose not to do so
 
 
 [2]
 27 C.F.R. Sec. 71.41 (detailing formal rulemaking procedures)
 
 
 [3]
 Defendant also contends that the court erred in excluding Manning's testimony that it was possible to possess a legal, semi-automatic Sten. A reading of the transcript reveals that Manning would have given his expert opinion on the legal significance of BATF regulations. Such testimony, as analyzed above, is not a proper subject for an expert. [TR 384]
 
 
 [4]
 That case, Woodbridge v. United States, No. 93-35821, was calendared with the present appeal. We affirmed the district court's judgment
 
 
 [5]
 Woodbridge contends that the district court erroneously excluded the testimony of metallurgist Richard Schefsky, who would have testified that one of the weapons appeared to be new, and that the others did not appear to have been fired in the automatic mode. [TR 199] [CR 91, Schefsky Affidavit] Even assuming, arguendo, that the court erred in excluding this evidence, there was sufficient circumstantial evidence of Woodbridge's knowledge to render the error harmless beyond a reasonable doubt
 
 
 [6]
 Compare United States v. Christiansen, 958 F.2d 285, 288 (9th Cir.1992) (credit union manager used her position to embezzle funds and conceal the theft for extended period of time; United States v. Pascucci, 943 F.2d 1032, 1037 (9th Cir.1991) (U.S. Marshall used his contacts at the Marshall's Service to obtain information about an individual for the purpose of extortion and blackmail); United States v. Foreman, 926 F.2d 792, 795-97 (9th Cir.1990) (police officer used her position to attempt to deflect investigation of her drug trafficking activities)