95 F.3d 1160
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Johnny Horton WEEKES, Defendant-Appellant,
UNITED STATES of America, Plaintiff-Appellee,
v.
Lori WEEKES, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Amy Wendell RICE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Tim WEEKES, Defendant-Appellant.
 No. 95-30068 to 95-30071.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Dec. 5, 1995.
Decided Aug. 21, 1996.
 
 1
 Before: D.W. NELSON, and NOONAN, Circuit Judges, and TANNER* District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 Johnny Weekes, Lori Weekes, Amy Rice and Tim Weekes all challenge the district court's imposition of sentences following their guilty pleas to an indictment charging them with manufacturing and distributing methamphetamine. We have jurisdiction over this timely appeal.
 
 STANDARDS OF REVIEW
 
 4
 "The district court's interpretation and application of the sentencing guidelines are reviewed de novo." United States v. Basinger, 60 F.3d 1400, 1409 (9th Cir.1995)." The court's underlying factual findings, including the capability of a drug operation, are reviewed for clear error." Id; United States v. Naranjo, 52 F.3d 245, 248-49 (9th Cir.1995) (quantity of drugs reasonably foreseeable is factual finding reviewed for clear error); United States v. Fuentes-Mendoza, 56 F.3d 1113, 1116-17 (9th Cir.1995), cert. denied, 116 S.Ct. 326 (1995) (possession of weapon is factual finding reviewed for clear error); United States v. Pinkney, 15 F.3d 825, 827 (9th Cir.1994) (decision to apply a 3B1.2 adjustment is reviewed for clear error).
 
 
 5
 I. The district court did not err in estimating the amount of methamphetamine involved in the conspiracy.
 
 
 6
 Because the "amount [of methamphetamine] seized does not reflect the scale of the offense", the district court "approximate[d] the quantity of the controlled substance." U.S.S.G. § 2D1.1, comment. (n. 12). Tim Weekes and Lori Weekes challenge the district court's decision to use a conversion factor of 62.5% ephedrine to methamphetamine. Lori Weekes also challenges the district court's alternative finding that the conspiracy produced 36 ounces (1.02 kilograms) of methamphetamine based on Lori Weekes' own statements that the conspirators produced 1-2 ounces per week between November 15, 1993 and March 31, 1994. She argues that the court should have used the average of 1.5 ounces per week instead of 2 ounces per week to arrive at a lower figure.
 
 
 7
 The quantity of drugs imputed to a defendant is determined by the district court at sentencing. United States v. Harrison-Philpot, 978 F.2d 1520, 1522 (9th Cir.1992), cert. denied, 113 S.Ct. 2392 (1993). The government must prove the quantity by a preponderance of the evidence. Id. at 1523. However, in meeting this burden, the government and the district court may rely on the factual findings in the PSR. United States v. (Michael Ray) Williams, 41 F.3d 496, 499 (9th Cir.1994).
 
 
 8
 The district court was faced with conflicting evidence on the amount of methamphetamine produced. There was the report of the Lori Weekes interview and agent Denhardt's grand jury testimony that provided a basis for determining the yield at between 9% and 22%. There was the PSR recommendation based on two studies that the reduction of ephedrine to methamphetamine would yield between 50% and 75%, and as high as 80%. Finally, there was Lori Weekes testimony that they manufactured between one and two ounces per week. The district court was entitled to rely on the testimony of the actual amount produced and upon the factual findings in the presentence report. Even using 1.5 ounces per week (as Lori Weekes argues), the conspirators would be responsible for 765 grams of methamphetamine (27 ounces x 28.35 grams) which is level 30 under the guidelines. The district court arrived at a base offense level of 30, after calculating the quantity of drugs to equate to a level 32, by reducing it two levels in "trying to be conservative."
 
 
 9
 The district court was not clearly erroneous in finding (1) that a 62.5% yield equating to 1,046.87 grams was produced or, alternatively, (2) that 36 ounces (1.02 kilograms) was produced, and, (3) further reducing the base offense level to 30 representing 700-1000 grams of methamphetamine. The evidence does not leave this panel "firmly convinced that a mistake has been made." United States v. (Jearold Kenneth) Williams, 989 F.2d 1061, 1073 (9th Cir.1993).
 
 
 10
 Tim Weekes argues that the district court failed to make factual findings on the amount of drugs produced. However, the district court judge did make a finding on the challenges to the yield when he addressed the finding made in the PSR of a 50 to 75% yield and then stated:
 
 
 11
 But the range was 50 to 75 percent for these clandestine operations, and I think the presentence investigator felt comfortable with 75, but again in trying to be conservative and make sure that the Court is on the conservative side, I decided it would be appropriate to take 62 and a half percent, the middle range between 50 and 75 percent.
 
 
 12
 In his brief to this court, Tim Weekes makes the argument that defendants' method used to manufacture methamphetamine did not equate to the method used by the chemists cited by the PSR writer, and therefore, did not equate to a 50% to 75% yield. However, Tim Weekes did not make this specific argument in his objections to the PSR nor to the district court and the district court did make factual findings on the argument that was put forth, i.e., that the yield was erroneously calculated. The district court relied on the PSR's range of 50%-75% and explicitly rejected the PSR's calculation of a yield of 75% in determining the yield to be 62.5%. A district court is entitled to rely on factual findings set forth in a PSR. ( Michael Ray) Williams, 41 F.3d at 499 (9th Cir.1994).
 
 
 13
 This court will not rule upon an issue presented for the first time on appeal unless one of three exceptions is met: (1) exceptional circumstances exist which mandate review to prevent a miscarriage of justice; (2) a new issue arises because of a change in the law; or (3) the issue is purely one of law and either does not depend on the factual record below, or the factual record below has been fully developed. United States v. Reyes-Alvarado, 963 F.2d 1184, 1189 (9th Cir.1992) cert. denied, 113 S.Ct. 258 (1992). None of these exceptions to the rule is present in this case; therefore, we hold that Tim Weekes has waived this "method" argument.
 
 
 14
 The district court made the necessary factual finding and the finding was not clearly erroneous.
 
 
 15
 II. The district court did not err in determining the amount of methamphetamine under U.S.S.G. § 1B1.3(a)(1)(B) regarding the foreseeability of illegal acts and the scope of the jointly undertaken criminal activity.
 
 
 16
 "Under the Guidelines each conspirator, for sentencing purposes, is to be judged not on the distribution made by the entire conspiracy but on the basis of the quantity of drugs which he reasonably foresaw or fell within 'the scope' of his particular agreement with the conspirators." United States v. Petty, 992 F.2d 887, 890 (9th Cir.1993). See also, U.S.S.G. § 1B1.3 comment. (n. 2) ("in the case of jointly undertaken criminal activity, [the defendant is responsible for] all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he undertook.").
 
 Johnny Weeks
 
 17
 The district court found that Johnny Weekes' major role in this conspiracy was as the "cook." The district court attributed all 67,000 "mini-thins" to him as recommended by the PSR. He argues (as does Tim Weekes) that the district court should have excluded 30,000 "mini-thins" that Martin and Martineau used to attempt to manufacture methamphetamine. He argues that it was not part of their jointly undertaken activity for Martin and Martineau to cook methamphetamine, and that he should not be held responsible for those 30,000 "mini-thins."
 
 
 18
 As a result of Lori Weekes' testimony, however, the district court found that "that the laboratory was producing one to two ounces of meth per week while Lori Weekes and the Defendant were living in Idaho between November 15, 1993, and March 31, 1994, for a total of 36 ounces. That would calculate out to be 1.02 kilograms, still keeping it at a base offense level of 32." Because Johnny Weekes does not challenge that he was the Idaho "cook," this finding that the Idaho lab produced 1.02 kilograms clearly demonstrates that this amount of methamphetamine was reasonably foreseeable by Johnny Weekes and was part of the jointly undertaken criminal activity.
 
 
 19
 Johnny Weekes also argues that Martin and Martineau were excluded from the conspiracy in February or March of 1994 and therefore the "mini-thins" which arrived after that date should not be attributed to him. However, the evidence showed Martin and Martineau were scheduled to attend the match-pulling party at Johnny Weekes' residence on April 19, 1994, and that a Mother Nature's envelope and box addressed to Martin was discovered at Johnny Weekes during the search on April 20, 1994. The C.O.D. receipt signed by Johnny Weekes was dated April 19, 1994. This evidence weighs against Johnny Weekes' arguments and supports the district court's finding holding Johnny Weekes responsible for the entire amount of methamphetamine manufactured.
 
 
 20
 Therefore, the district court's finding that Johnny Weekes was responsible for the total amount of methamphetamine produced was not clearly erroneous.
 
 TIM WEEKES
 
 21
 Tim Weekes makes one argument in addition to the two arguments made by his brother Johnny in attempting to reduce the amount of drugs for which he was held responsible. He argues that his arrest of March 31, 1994 relieves him of responsibility for anything occurring after his arrest. "The law on withdrawal from a conspiracy requires a conspirator to take some action indicating disavowal of the conspiracy. [citation omitted]. As a general rule, the fact that a conspirator is taken into custody does not automatically indicate disavowal of the conspiracy." United States v. Johnson, 956 F.2d 894, 906-07 (9th Cir.1992). The exception is for minor participants. Id. Tim does not argue that he took any affirmative steps to withdraw from the conspiracy, and he certainly was not a minor participant. Tim Weekes' role was as the major distributor of the methamphetamine manufactured by Johnny Weekes.
 
 
 22
 Therefore, the court's finding that Tim Weekes was responsible for the total amount of methamphetamine produced was not clearly erroneous.
 
 AMY RICE
 
 23
 Rice argues (1) that she should not be held accountable for the purchase of the "mini-thins" because she was not aware of the purchase nor did she benefit from it, and (2) that she should only be held responsible for two deliveries wherein she pointed out the location of drugs to purchasers on two separate occasions.
 
 
 24
 The district court set Rice's base offense level at 28 (400-700 grams) based on the fact that Rice didn't move into Tim Weekes' home until December 16, 1993. The court went on to reduce the base by three points for acceptance of responsibility and another three points for minor participant to get to a level 22 which is 41-51 months. The district court then accepted the government's 5K1.1 motion and sentenced Rice to 24 months confinement.
 
 
 25
 Rice relies on an Eighth Circuit case, United States v. North, 900 F.2d 131 (8th Cir.1990) for her arguments. North is distinguishable. The Eighth Circuit held that the minor participant in that case had no knowledge, received no benefit, and did not participate in certain of the illegal acts of his co-conspirator, North, 900 F.2d at 133; accordingly, he would not be held accountable for those crimes. In this matter, however, the district court found that Rice's knowledge of and involvement in the conspiracy was greateer than she acknowledged; thus the court held her responsible for the methamphetamine produced while she lived with Tim Weekes in setting the base offense level at 28. This finding, based on the evidence, is not clearly erroneous.
 
 
 26
 II.a. The district court made the requisite factual findings concerning the joint activity of Johnny and Timothy Weekes.
 
 
 27
 Tim Weekes argues that the district court failed to make the requisite factual findings on the scope of his jointly undertaken activity. This was a relatively small conspiracy wherein the district court found that Johnny and Lori Weekes were the "cooks," Martin and Martineau obtained the "mini-thins" and Tim Weekes was the main distributor. The district court clearly addressed the foreseeability of the jointly undertaken criminal activity, and furthermore, in the addendum to Tim Weekes' PSR, the probation officer sets forth his reasons for the decision to attribute the entire amount of drugs to Tim Weekes. The district court is entitled to rely on factual findings in the PSR as long as they are supported by some evidence and are not "conclusory." See (Michael Ray) Williams, 41 F.3d at 499.
 
 
 28
 The district court made the requisite factual findings as to whether Tim Weekes court foresee the scope of the jointly undertaken criminal activity.
 
 
 29
 III. The district court did not err in assessing Lori Weekes a two point firearm assessment under U.S.S.G. § 2D1.1(b)(1).
 
 
 30
 Lori Weekes argues that she should not have been assessed two points under U.S.S.G. § 2D1.1(b)1 for possession of a weapon during the drug trafficking offense. The district court need only find by a preponderance of the evidence that the weapon was possessed. United States v. Restrepo, 946 F.2d 654, 661 (9th Cir.1991), cert. denied, 112 S.Ct. 1564 (1992).
 
 
 31
 Section 2D1.1(b)(1) provides that a defendant's base offense level should be increased two levels if a dangerous weapon was possessed in relation to a drug trafficking crime. Application note 3 provides, in pertinent part:
 
 
 32
 The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet.
 
 
 33
 U.S.S.G. § 2D1.1(b)(1) comment. (n. 3).
 
 
 34
 During the search of Johnny and Lori Weekes' residence on April 20, 1994, six firearms were found, including a Ruger PA9 9 mm. semi-automatic pistol, a Ruger Blackhawk 357 revolver (single action), a Colt Diamondback .22 revolver, and an SKS 7.62x39 semi-automatic rifle. They were found in close proximity to various items containing ephedrine and methamphetamine residue, and some were locked up. Lori Weekes argues that she only used the weapons for hunting purposes. However, an ATF agent informed the court that the SKS rifle was not suitable for sporting purposes, and that the Ruger 9 mm. semi-automatic pistol and the .22 revolver are not commonly used for hunting. The district court so found.
 
 
 35
 Furthermore, the district court found that the guns were used in a threatening manner by codefendants Johnny and Tim Weekes. The possession of a weapon by a codefendant is attributable to other defendants if that possession is reasonably foreseeable. United States v. Garcia, 909 F.2d 1346, 1349-50 (9th Cir.1990). Here, Lori Weekes was clearly aware of the possession of weapons.
 
 
 36
 The district court was not clearly erroneous in applying the two level weapon enhancement to Lori Weekes.
 
 
 37
 IV. The district court did not err in giving Amy Rice a three point role reduction rather than a four point minimal participant reduction under U.S.S.G. § 3B1.2(a).
 
 
 38
 Rice argues that she should have been given a four point reduction for minimal participant rather than a three point reduction pursuant to U.S.S.G. § 3B1.2. The district court found:
 
 
 39
 My judgment that your involvement and knowledge of conspiracy, the acts of the co-conspiracy was greater than what you have acknowledged here in Court. Nevertheless, the Court recognized that it was somewhat less than the others.
 
 
 40
 He then stated: "I think you are entitled to a further reduction of 3 points for your minor role in the offense...." Id.
 
 
 41
 The application notes to U.S.S.G. § 3B1.2 provide that it is "the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant." U.S.S.G. § 3B1.2 comment. (n. 1). Further, application note 2 states that "[i]t is intended that the downward adjustment for a minimal participant be used infrequently." Rice was in the house and was aware that methamphetamine was being manufactured and distributed from the house she shared with Tim Weekes. The district court was not clearly erroneous in reducing Rice's base offense level three, rather than four levels.
 
 
 42
 V. 18 U.S.C. § 924(c).
 
 
 43
 Subsequent to the submission of this case, Appellants Johnny Horton Weekes, Lori Anne Weekes and Tim Ersel Weekes moved to raise as an additional issue the applicability of the recent case of Bailey v. United States, 116 S.Ct. 501 (1995). We denied Lori Anne Weekes' motion and requested further briefing from Tim Ersel Weekes and Johnny Horton Weekes.
 
 
 44
 This matter is remanded to the district court to consider the effect, if any, of the Bailey decision on defendants' judgments and sentences.
 
 
 45
 AFFIRMED in part and REMANDED for further proceedings consistent with this memorandum.
 
 
 
 *
 Honorable Jack E. Tanner, Senior United States District Judge for the Western District of Washington, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3