**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Lorenzo NARANJO, Defendant–Appellant.**

No. 93–10732.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 14, 1994.

Decided April 10, 1995.

William G. Panzer and Dennis Roberts, Oakland, CA, for defendant-appellant.

Leo P. Cunningham, Asst. U.S. Atty., San Jose, CA, for plaintiff-appellee.

Before LAY,* PREGERSON, and O'SCANNLAIN, Circuit Judges.

PREGERSON, Circuit Judge:

Appellant Lorenzo Naranjo appeals his sentence under 21 U.S.C. § 841(b)(1)(A)(ii), which imposed a mandatory 10 year term of imprisonment for conspiracy to possess with intent to distribute five or more kilograms of cocaine. Naranjo pled guilty to violating 21 U.S.C. § 846 (conspiracy to possess with intent to distribute cocaine) and 31 U.S.C. § 5324 (cash transaction structured to evade reporting requirements). We have jurisdiction under 28 U.S.C. § 1291 and Rule 4(b) of the Federal Rules of Appellate Procedure.

We vacate the sentence and remand for further proceedings.

## I. BACKGROUND

From January to June 1992, Naranjo was under investigation by the Drug Enforcement Administration (DEA) because Richard Strini, a confidential informant for the DEA, and a friend of Naranjo's, told the DEA that Naranjo had been trafficking in narcotics for about the past eight to ten years.[1] At the DEA's urging, Strini contacted Naranjo almost forty times by telephone from January through nearly the end of May in an attempt to get Naranjo to sell cocaine to Strini. Naranjo rejected all of Strini's requests to sell cocaine to him.[2]

After Naranjo rejected Strini's many overtures to sell cocaine, the DEA told Strini to reverse the operation; Strini should now inform Naranjo that he could put Naranjo in contact with people from whom Naranjo could buy cocaine. The DEA directed Strini to suggest to Naranjo a purchase in the ten to twenty kilogram range. Strini told the DEA that Naranjo would never make such a large purchase. When the DEA told Strini to try to persuade Naranjo to buy five or ten kilograms, Strini recommended to the DEA that it set up only a one to two kilogram buy with Naranjo.

During a telephone call in May 1992, Strini first approached Naranjo about his buying cocaine. Naranjo indicated a willingness to buy but said to Strini, "grab me one" (one kilogram) only if the buy can be "fronted" for as long as a week; that is, Naranjo wanted a week before he had to pay for the one kilogram. Strini asked Naranjo how much Naranjo could sell if Naranjo was fronted for 24 hours. Naranjo answered, one-half a kilogram. Because Strini was unable to persuade Naranjo to buy five to ten kilograms of cocaine, the DEA told Strini to persuade Naranjo to meet with the seller. The seller, an undercover DEA agent, would handle the issue of weight.

Naranjo agreed to meet with Strini about a week later to discuss buying cocaine. At this first meeting, Strini introduced Naranjo to the DEA undercover agent Pete Ramirez. Naranjo was surprised by Ramirez's presence because Naranjo thought the meeting would be between just Strini and himself. After some preliminary discussion, Agent Ramirez indicated he wanted to sell Naranjo five kilograms of cocaine now, and five more within a couple of days. Naranjo indicated he did not have the resources to buy five kilograms. At this point, Strini leaned over to Naranjo and said he, Strini, could buy "three maybe four" kilograms from Naranjo.[3]

At this same meeting, Naranjo's nephew, Humberto Arguello, later joined Naranjo, Ramirez, and Strini. Arguello apparently said nothing, and before the negotiations had

---

* The Honorable Donald P. Lay, Senior Circuit Judge for the Eighth Circuit Court of Appeals, sitting by designation.

1. Strini became a confidential informant for the DEA after his arrest and conviction in early 1992 for a cocaine violation. Strini claimed in a declaration that he became a DEA informant to secure a more favorable sentence for his drug trafficking conviction.

2. Strini stated in his declaration that he was told by the DEA to persuade Naranjo to sell Strini a substantial quantity of cocaine. Strini informed the DEA he could purchase a quarter of a pound of cocaine from Naranjo. The DEA told Strini not to bother because that was not enough weight.

3. Strini stated in his declaration that he made the offer to buy three or four kilograms from Naranjo because Strini thought that the more cocaine he encouraged Naranjo to buy, the more favorable his sentence would be.

ended, returned to Naranjo's van in the restaurant parking lot. At the conclusion of the meeting, as Naranjo and Ramirez were leaving the restaurant, Naranjo remarked to Ramirez that Arguello was his bodyguard and that Arguello checks to see that everything is all right during a buy.

Naranjo and Arguello had a second meeting with Agent Ramirez two days later. Arguello remained at a table with Naranjo and Ramirez for most of the meeting. At this meeting, Ramirez agreed to sell Naranjo two kilograms of cocaine, at $18,500 per kilogram, and front him three additional kilograms of cocaine to be paid for in three days. With regard to delivery, Ramirez indicated the five kilograms of cocaine would be placed in a vehicle with a secret compartment and Naranjo and Arguello could drive the vehicle away. The vehicle was to be returned when Naranjo paid for the remaining three kilograms.

Several days later, Ramirez telephoned Naranjo to inform him that the cocaine had arrived. Naranjo handed the telephone to Arguello to get instructions for the delivery. Ramirez told Arguello that the delivery would take place the next day at the Mexico Lindo restaurant, and he gave Arguello directions to the restaurant. Ramirez then reiterated to Arguello that the transaction was for five kilograms. Arguello answered "No, no ... for two I tell you." Ramirez repeated "five, right?" to which Arguello answered, "Yes, yes, no but for two, for two days?" Ramirez added, "five tomorrow" and "I will save you five more for one day." Arguello said, "Oh, ok," to both of Ramirez's statements.

The following day, Naranjo and Arguello met Ramirez and a second undercover DEA agent, John Carillo, at the Mexico Lindo restaurant. Naranjo informed Ramirez that he had enough money to pay for only one kilogram of cocaine, but that he could pay for the remaining four kilograms the following morning. Ramirez agreed to go forward with the transaction, now "fronting" Naranjo four kilograms of cocaine. After Arguello paid $18,500 for one kilogram of cocaine to Ramirez, Agent Carillo drove Arguello to a second location to inspect the cocaine. Arguello inspected the cocaine and noted that there were five bags. However, Arguello was dissatisfied that the vehicle did not have a secret compartment, as promised, and he was concerned that he had been followed by an airplane. Arguello returned to the Mexico Lindo restaurant without taking delivery of any of the five kilograms of cocaine.

After Naranjo talked with Arguello, Naranjo made new arrangements with Ramirez for the transfer of the five kilograms of cocaine. Ramirez told Naranjo and Arguello to meet him and Carillo at a designated Burger King for the transfer. Following the arrival of all four parties at the Burger King, Naranjo and Ramirez got out of their vehicles and walked towards the restaurant. Shortly thereafter, Carillo tossed the duffle bag containing the five kilograms of cocaine into Naranjo's van, which had its sliding side door open.[4] Naranjo and Arguello were then arrested.

The government then filed a two count information charging Naranjo and Arguello with violating 21 U.S.C. § 846 (conspiracy to possess with intent to distribute cocaine) and charging Naranjo with violating 31 U.S.C. § 5324 (cash transaction structuring).[5] Naranjo pled guilty to both counts of the information, pursuant to a plea agreement. However, the plea agreement stated that Naranjo "expressly disagrees as to the amount of cocaine upon which the determination of the mandatory sentence should be based...."

At a single sentencing hearing for Naranjo and Arguello, where no oral testimony was

---

4. Arguably a delivery did *not* take place. Naranjo's Presentencing Report states that after Ramirez and Naranjo walked towards the restaurant, Agent Carillo told Arguello that he had to use the bathroom, and asked Arguello to guard the cocaine in the meantime. Arguello nodded, indicating he would guard it, and told Carillo to throw the duffle bag containing the cocaine into the back seat of the van. Further, Naranjo maintains that at this point he was in the Burger King trying to get his money back from Ramirez because Naranjo did not want to go through with the transaction.

5. The second count stemmed from August 1987 cash transactions connected to Naranjo's purchase of his home.

taken, the district court concluded that the evidence presented did not support a finding of "sentencing entrapment." [6] Further, the district court found that as to Naranjo, "under all the circumstances treating the transaction as a five-kilogram transaction is appropriate." The district court's finding resulted in Naranjo being sentenced under 21 U.S.C. § 841(b)(1)(A)(ii), which carries a mandatory minimum sentence of ten years.[7] The district court's written judgment stated that Naranjo's "[c]riminal history and offenses do not justify a sentence in excess of the mandatory minimum." Thus, Naranjo was sentenced to the mandatory minimum sentence of ten years.

As to Arguello, the district court first noted the telephone conversation between Arguello and Ramirez where "five" was mentioned by Arguello. But the district court then stated, "I'm just not convinced that I know for sure what that means," and concluded that Arguello's "other actions would certainly be consistent with his thinking he was involved in a one- to two-kilogram deal, so I'm going to treat his case as involving two kilograms of cocaine...." The district court thus sentenced Arguello under 21 U.S.C. § 841(b)(1)(B)(ii), which carries a mandatory minimum sentence of five years.

## II.  ANALYSIS

Naranjo now appeals his sentence on two grounds. First, Naranjo contends that the district court erred when it based Naranjo's sentence on a finding that Naranjo was involved in a five-kilogram cocaine transaction but based Arguello's sentence on a finding that Arguello, Naranjo's sole co-conspirator, was involved in only a two-kilogram cocaine transaction. Second, Naranjo contends the district court erred when it found that the government did not engage in sentencing entrapment.

We review the interpretation and application of the Sentencing Guidelines de novo. *United States v. Buenrostro–Torres,* 24 F.3d 1173, 1174 (9th Cir.1994). Factual findings in the sentencing phase are reviewed for clear error. *Id.; United States v. Chapnick,* 963 F.2d 224, 226 (9th Cir.1992).

The quantity of drugs for which a defendant is responsible is determined by the court at sentencing. *United States v. Becerra,* 992 F.2d 960, 966 (9th Cir.1993) (citing *United States v. Harrison–Philpot,* 978 F.2d 1520, 1523 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2392, 124 L.Ed.2d 294 (1993)). The government has the burden of proving by a preponderance of the evidence the quantity of drugs for which a defendant is responsible. It is this quantity that determines the defendant's base offense level. *Id.* (citing *Harrison–Philpot* at 1522 and *United States v. Howard,* 894 F.2d 1085, 1090 (9th Cir.1990)).

Since Naranjo pled guilty to violating 21 U.S.C. § 846 (conspiracy to possess with intent to distribute cocaine) but expressly disagreed as to the amount of cocaine upon which the sentence should be based, the district court had to determine the amount of cocaine with which Naranjo was involved. A district court's finding that a defendant was involved in a cocaine transaction involving five-kilograms of cocaine automatically brings a defendant under 21 U.S.C. § 841(b)(1)(A)(ii), which carries a ten-year mandatory minimum sentence. A transaction involving less than five-kilograms of cocaine automatically puts a defendant within § 841(b)(1)(B)(ii), which carries a five-year mandatory minimum sentence.

### A.  Sentencing Disparity

■ Naranjo contends that co-conspirators in a conspiracy comprised of *only two* co-conspirators cannot have an agreement to buy different quantities of drugs. Naranjo

---

6. In *United States v. Staufer,* we stated "[s]entencing entrapment or 'sentence factor manipulation' occurs when 'a defendant, although predisposed to commit a minor or lesser offense, is entrapped in committing a greater offense subject to greater punishment.'" 38 F.3d 1103, 1106 (9th Cir.1994) (quoting *United States v. Stuart,* 923 F.2d 607, 614 (9th Cir.), *cert. denied,*

499 U.S. 967, 111 S.Ct. 1599, 113 L.Ed.2d 662 (1991)).

7.  On count two, the cash transaction count, the district court sentenced Naranjo to twelve months to be served concurrently with count one.

argues that the district court's finding that Arguello conspired to buy just two kilograms of cocaine defined the limits of the conspiracy.[8] Accordingly, Naranjo argues that under *United States v. Sergio*, 934 F.2d 875 (9th Cir.1991), the district court could not, as a matter of law, find that Naranjo, as the sole co-conspirator with Arguello, conspired to buy five kilograms of cocaine.

Naranjo's reliance on *Sergio* is misplaced. In *Sergio*, we stated that "the scope of an agreement determines the scope of the conspiracy, which in turn determines the scope of derivative liability under the Guidelines." *Id.* at 878. But *Sergio* does not support Naranjo's contention that two co-conspirators cannot have an agreement in which the amount of drugs for each individual is different. Rather, as the government contends, in determining the amount of drugs for co-conspirators the district court is to treat each defendant separately by analyzing each co-conspirator's involvement in the drug transaction.

We stated in *United States v. Petty*, 992 F.2d 887, 890 (9th Cir.1993), that "[u]nder the Guidelines *each* conspirator, *for sentencing purposes,* is to be judged not on the distribution made by the entire conspiracy but on the basis of the quantity of drugs which he reasonably foresaw or which fell within 'the scope' of his particular agreement with the conspirators." (Emphasis added.) Further, the Commentary to U.S.S.G. § 1B1.3, Application Note 2, states that in a "'jointly undertaken criminal activity' ... the court must first determine the scope of the criminal activity the *particular* defendant

agreed to jointly undertake...." (Emphasis added.)[9] Therefore, as a matter of law, the district court may find that Naranjo was involved in a conspiracy to buy five kilograms of cocaine and at the same time find that Naranjo's co-conspirator, Arguello, understood the conspiracy to involve a lesser quantity of cocaine.[10]

In determining that Naranjo was responsible for five kilograms, the district court expressly adopted the factual findings of the presentence report. A district court may adopt the factual findings of the presentence report, but the court may not "adopt conclusory statements unsupported by facts or the Guidelines." *United States v. Navarro*, 979 F.2d 786, 789 (9th Cir.1992). We conclude that while it would have been preferable for the district court to indicate which parts of the presentence report it based its sentencing decision upon, the district court did not clearly err in adopting the presentence report's finding that Naranjo was involved in a five-kilogram cocaine transaction.[11]

### B. Sentencing Entrapment

■ The district court's finding that Naranjo was involved in a five-kilogram cocaine transaction does not preclude a finding of sentencing entrapment. We now address Naranjo's alternative argument that the district court erred in not finding that the government engaged in sentencing entrapment.

Naranjo concedes that he was predisposed to dealing in cocaine, but he argues that "he was predisposed to dealing in substantially

---

**8.** The government contends that Naranjo waived his right to raise this argument because he did not raise it in the district court at the time of sentencing. But nothing in the record before us indicates that Naranjo had notice, before the court announced the two sentences, that it would hand down disparate sentences. Thus we conclude that Naranjo did not waive his right to raise this argument before this court.

**9.** This "Relevant Conduct" section is applied in tandem with U.S.S.G. § 2D1.1, the offense guideline for drug offenses, to determine the base offense level. Naranjo was sentenced under 21 U.S.C. § 841(b)(1)(A)(ii), but the court's determination as to the quantity of drugs for which a defendant is responsible is a sentencing issue governed by the Sentencing Guidelines.

**10.** *See also United States v. Egbuniwe*, 969 F.2d 757, 764 (9th Cir.1992) (a district court, exercising leniency in sentencing one defendant, may find a co-defendant accountable for a larger quantity of drugs); *United States v. Carpenter*, 914 F.2d 1131, 1136 (9th Cir.1990) (equalization is not a factor specified in the Guidelines).

**11.** We need not address Naranjo's companion argument that the district court erred in calculating his total offense level. This argument also erroneously presumes that the district court was restricted to finding that Naranjo was involved in a two-kilogram cocaine transaction once it found his co-conspirator was involved in a two-kilogram transaction.

smaller quantities of cocaine than five kilograms...." Naranjo argues that he would not have negotiated a transaction for five kilograms of cocaine but for the government's unusually favorable financial terms. To support his entrapment argument, Naranjo relies on U.S.S.G. Commentary to § 2D1.1, Application Note 12, and Application Note 17 (November 1993, ed.).

Application Note 12 instructs as follows: [W]here the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing.

Application Note 17 states, in relevant part: If, in a reverse sting ... the court finds that the government agent set a price for the controlled substance that was substantially below the market value of the controlled substance, thereby leading to the defendant's purchase of a significantly greater quantity of the controlled substance than his available resources would have allowed him to purchase except for the artificially low price set by the government agent, a downward departure may be warranted.

We find Naranjo's sentencing entrapment theory convincing. Application Notes 12 and 17 clearly require the district court to determine whether sentencing entrapment has occurred. Under Note 12, the district court "shall exclude" from the calculation the amount of drugs which flow from sentencing entrapment. Further, under Note 17, a downward departure is warranted when sentencing entrapment occurs.[12]

There is further support for Naranjo's theory in *United States v. Staufer*, 38 F.3d 1103 (9th Cir.1994). In *Staufer*, we noted that Application Note 17 "only addresses one of the ways in which drug enforcement agents are able to manipulate sentences." *Id.* at 1107. We stated further:

The significance of the Amendment [Application Note 17] is that it shows that the Sentencing Commission is aware of the unfairness and arbitrariness of allowing drug enforcement agents to put unwarranted pressure on a defendant in order to increase his or her sentence without regard for his predisposition, his capacity to commit the crime on his own....

*Id.*

The government correctly points out that Naranjo has the burden of proof to demonstrate that he had neither the intent nor the resources for completing a five-kilogram cocaine transaction.[13] However, although Naranjo has the burden of proof, the district court is obligated to make express factual findings as to whether Naranjo met this burden. *United States v. Conkins*, 9 F.3d 1377, 1386–87 (9th Cir.1993) (citing *Navarro*, 979 F.2d at 788–89). The district court failed to make such findings.

At Naranjo's sentencing hearing, the district court stated it was "not entirely comfortable with the way this case went in the sense that it does seem like there was some effort on the government's part to ensure that Mr. Naranjo engage in a transaction involving a significant amount of drugs." But the court ultimately found that sentencing entrapment had not occurred because "if you look at the full situation, it seems pretty clear that [the DEA] had a pretty good reason to believe that [Naranjo] had been heavily involved in drug trafficking." This statement lacks the specificity required by *Conkins*, especially since it fails to provide any

---

**12.** For the proposition that a reverse sting operation comes within Application Note 12, *see United States v. Hill*, 953 F.2d 452, 460 (9th Cir.1991) (sentencing court calculated sentence in a reverse sting relying on U.S.S.G. § 2D1.4, Application Note 2). Although § 2D1.4 has been deleted from the Sentencing Guidelines, the identical sentencing entrapment provision of Application Note 2 relied on in *Hill* is now contained in Application Note 12.

**13.** In making a sentencing entrapment claim, the burden is on the defendant to demonstrate both the lack of intent to produce and the lack of the capability to produce the quantity of drugs at issue. *United States v. Steward*, 16 F.3d 317, 321–22 (9th Cir.1994) (citing *United States v. Barnes*, 993 F.2d 680, 682 n. 1 (9th Cir.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 96, 130 L.Ed.2d 46 (1994)).

finding relevant to the critical issue of Naranjo's predisposition to engage in a five-kilogram cocaine transaction.

In making its findings as to sentencing entrapment, the district court merely adopted the DEA's belief that Naranjo was previously involved in drug trafficking. Yet, Naranjo has no previous arrests. More critically, apparently the only basis for the DEA's theory about Naranjo was a statement by the informant Strini, who was working for the DEA in hopes of obtaining a more favorable sentence in connection with his own conviction for drug trafficking.

In the absence of specific findings on the record, we are uncertain as to what findings the district court relied on in finding Naranjo predisposed to cocaine dealing, other than the DEA's theory, gleaned from an informant, that Naranjo had previously been involved in drug trafficking. Moreover, the DEA's belief that Naranjo was involved in drug trafficking does not controvert Naranjo's contention that he would not have engaged in a five-kilogram cocaine transaction but for the DEA's structuring the transaction on unusually favorable financial terms.

Our reading of the record strongly suggests that Naranjo had neither the intent nor the resources to engage in a five-kilogram cocaine transaction. Naranjo ultimately had only enough money for a single kilogram of cocaine, as Strini had forewarned the DEA. This explains why Strini offered to buy back from Naranjo three to four kilograms of the five kilograms of cocaine proffered by the DEA agents. Strini knew that without his buy-back offer Naranjo would never go forward with a five-kilogram cocaine transaction with the undercover DEA agents. Further, Naranjo's telephone conversation with Strini confirms that Naranjo was not predisposed to dealing in quantities of cocaine beyond a single kilogram, and that even then, Naranjo needed to be fronted for a week.

Finally, there is strong evidence that the DEA was trying to increase the quantity of cocaine Naranjo would purchase. First, when Strini told the DEA he could buy a quarter of a pound of cocaine from Naranjo, the DEA told Strini not to go through with the buy because it was not enough weight. Second, after Strini was unable to persuade Naranjo to buy five kilograms of cocaine, DEA agents moved in to deal directly with Naranjo to encourage his participation in a five-kilogram transaction. Significantly, Naranjo participated in a five-kilogram transaction only after the DEA and Strini structured a transaction in which Naranjo was fronted four kilograms of cocaine, and Strini offered to buy back three or four of the kilograms.[14]

### III. CONCLUSION

Because the district court provided no factual findings on the record, we are unable to ascertain what facts it relied upon in finding that Naranjo did not adequately prove sentencing entrapment.[15] Thus we vacate Naranjo's sentence and remand to the district court for resentencing with instructions to provide specific factual findings to support its ruling that Naranjo did not prove sentencing entrapment.

VACATED and REMANDED for resentencing.

---

**14.** The government originally argued that the only remedy for sentencing entrapment was a downward departure under Application Note 17. The district court rejected this approach. It stated at Naranjo's sentencing hearing that the proper remedy for sentencing entrapment is to deduct the amount of cocaine attributable to the government's sentencing entrapment conduct, and calculate the sentence based on only the remaining amount of cocaine. At this same hearing the government agreed with the district court's approach, which would bring Naranjo within the five-year statutory minimum sentence (under 21 U.S.C. § 841(b)(1)(A)) rather than the ten-year statutory minimum (under 21 U.S.C. § 841(b)(1)(B)).

**15.** Because we decide this case under the Sentencing Guidelines, we need not reach the government's argument that Naranjo's sentencing entrapment theory must fail since no circuit has recognized a *generalized* sentencing entrapment defense.