UNITED STATES of America,
Plaintiff—Appellee,

v.

Jose Antonio VEGA, Defendant—
Appellant.

United States of America,
Plaintiff—Appellee,

v.

Mario Vega, Defendant—Appellant.

Nos. 02–50253, 02–50499.
D.C. Nos. CR–01–00480–GAF,
CR–01–00480–GAF–03.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 2, 2004.

Decided April 7, 2004.

William C. Bottger, Jr., Debra A. Yang, Ronald L. Cheng, Elizabeth R. Yang, Office of the U.S. Attorney, Los Angeles, CA, for Plaintiff–Appellee.

Jose Antonio Vega, Reg.#16789–112, Taft, CA, pro se.

James M. Crawford, Orange, CA, Shakti Murthy, Santa Monica, CA, for Defendants–Appellants.

Before SILVERMAN, GOULD, and BEA, Circuit Judges.

MEMORANDUM *

Brothers Jose Antonio Vega ("Jose") and Mario Vega ("Mario") appeal their

---

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3.

jury trial convictions and sentences for conspiracy to possess, possession with intent to distribute, and distribution of heroin in violation of 21 U.S.C. §§ 841(a)(1), 846. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742, and we affirm.

In 2001, the Drug Enforcement Administration ("DEA"), and two local police departments began a joint undercover investigation into heroin trafficking in Los Angeles. Jose admitted at trial that he participated in a series of five controlled narcotics sales to DEA confidential informants, in amounts ranging from 1.83 grams to 25 grams of heroin. On or about May 10, 2001, in an effort to draw out Jose's supplier, the DEA arranged to buy $5000 of heroin from Jose. The next day, Mario drove to Jose's residence and gave him an automobile distributor coil, which contained approximately 233 grams of heroin. Jose was arrested after a confidential informant viewed the heroin-filled distributor coil at the buy site.

At about the time of Jose's arrest, other task force officers stopped Mario and conducted a narcotics search of his vehicle. Officers found approximately 81.3 grams of heroin located in a windshield wiper blade motor in the back seat of his Honda.

### I. Jose Antonio Vega

#### A. *Brady* Evidence

■ Jose contends that the district court erred by denying his motion for a new trial under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), because the government's failure to disclose evidence bearing on his credibility had a negative impact on his entrapment defense. Specifically, Jose challenges the government's failure to disclose his initial post-arrest statement, which corroborated

his trial testimony that "Juan"[1]—not his brother Mario—was his heroin supplier. Jose essentially contends that his prior consistent statement about Juan would have rehabilitated his credibility to such an extent that the jury would have believed his claim that he was not predisposed to sell large amounts of heroin, and that he only engaged in the transactions at the insistence of the DEA.

We review de novo a motion for a new trial based on an alleged *Brady* violation. *United States v. Hanna*, 55 F.3d 1456, 1459 (9th Cir.1995). Under *Brady*, the government must disclose any evidence that is both favorable to an accused and material either to guilt or punishment. *Banks v. Dretke*, —— U.S. ——, 124 S.Ct. 1256, 1272, 157 L.Ed.2d 1166 (2004). The *Brady* rule covers exculpatory evidence as well as impeachment evidence, *Hanna*, 55 F.3d at 1459, including material "bear[ing] on the credibility of a significant witness in the case," *United States v. Strifler*, 851 F.2d 1197, 1201 (9th Cir.1988). A conviction will be set aside if " 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *Banks*, 124 S.Ct. at 1276 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).

We agree with the district court that Jose's post-arrest statement that Juan was his heroin source is clearly inculpatory as to whether Jose sold heroin, and therefore does not constitute exculpatory evidence as to drug trafficking within the meaning of *Brady*.

However, our *Brady* inquiry does not end here, because Jose's prior consistent statement about Juan had the potential to affect the jury's view of Jose's credibility. During the trial, Jose consistently testified

---

**1.** "Juan" was never further identified, nor did anyone by that name testify at trial.

that his heroin source was Juan, and the government attempted to undermine Jose's credibility by presenting Jose's inconsistent written confession implicating Mario as his supplier. We must decide whether there is a "reasonable probability" that the jury would have believed Jose's entrapment defense had the jurors been aware of Jose's prior consistent statement about his supplier. *See Banks,* 124 S.Ct. at 1276. Given the facts of this case, and the substantial additional evidence undermining Jose's credibility, we hold that the withheld *Brady* evidence does not undermine confidence in the verdict. *See id.*

First, although the undisclosed materials corroborate Jose's trial testimony that his supplier was Juan, the materials also contain information that is inconsistent with the evidence produced at trial. Specifically, the excluded DEA notes reflect that Jose first told the officers that "a friend of Juan's brought [the heroin] to [his] house" in a Honda on May 11, 2001. At trial, however, Jose acknowledged that his brother Mario delivered the heroin-packed distributor cap to his home on May 11, 2001. Accordingly, while part of the undisclosed evidence corroborates Jose's testimony regarding Juan, other evidence shows that Jose was untruthful about who delivered the heroin to his home on May 11, 2001.

Second, even if the jury believed that Jose truthfully testified that his supplier was Juan—which it apparently did, given the failure to convict Mario during the first trial—Jose's testimony regarding Juan further undermines Jose's credibility, and belies his entrapment defense. For instance, Jose testified that on April 28, 2001, Juan dropped off a bag at his home with over $5000 worth of heroin in it, already packaged into car parts, because he was leaving town due to marital problems. The next day, Jose allegedly brought the bag with the heroin-filled car parts to the house where his brother Mario rented a room, and left it in Mario's garage, without telling anyone that the bag was there. The bag then sat in Mario's garage until May 11, 2001, when Jose asked Mario to return the bag to his home. In closing arguments, the government pointed to the "amazing coincidence" that the distributor coil that Juan gave Jose on April 28, 2001 happened to contain the exact amount of heroin that a DEA confidential informant would order on May 10, 2001, some twelve days later. In sum, this evidence may rehabilitate Jose's credibility to exonerate Mario, but it cuts against his entrapment defense because it shows that Jose had possession of large quantities of heroin—nearly ten times larger than the largest previous transaction—before a claimed order for drugs to entrap Jose, was even placed. Jose's story also suggests that it was Juan's marital troubles, and not the DEA order, which caused him to maintain a large inventory of heroin, and prompted him to attempt the last sale on May 11, 2001.

Third, Jose's testimony that he repeatedly sold heroin as a favor to a family friend named Chino, who was not a confidential informant, undercuts his claim that the DEA entrapped him into the drug transaction.

Fourth, Jose's attempt to explain his reasons for inculpating Mario in his post-arrest written confession was nonsensical– "I didn't want other people who had nothing to do to become involved ... [s]o I wrote down ... what [the Agent] wanted me to write down." Even assuming that Jose was concerned about the welfare of his wife and children, and wanted to please the interviewing officer, it made no sense for Jose to testify that he implicated his brother because he wanted to take full responsibility for the crime.

In sum, given the totality of the evidence presented, the excluded evidence regarding Juan would not have "put the whole case in such a different light as to undermine confidence" in the jury's rejection of Jose's entrapment defense. *Banks*, 124 S.Ct. at 1276.

## B. Sentencing Entrapment

■ Jose contends that the district court applied the wrong legal standard when it refused to grant him a two-level reduction in his base offense level for sentencing entrapment. More specifically, Jose contends that the district court incorrectly rejected the "predisposition" test articulated in *United States v. Staufer*, 38 F.3d 1103 (9th Cir.1994), and instead focused on whether Jose was "ready, willing and able" to commit a greater offense.

We lack jurisdiction to review the district court's discretionary refusal to depart downward. *United States v. Romero*, 293 F.3d 1120, 1126 (9th Cir.2002), *cert. denied*, 573 U.S. 1144, 123 S.Ct. 948, 154 L.Ed.2d 844 (2003). However, we review de novo the district court's refusal to depart based on an erroneous legal premise. *See id.*

"Sentencing entrapment ... occurs when a defendant, although predisposed to commit a minor or lesser offense, is entrapped in committing a greater offense subject to greater punishment." *Staufer*, 38 F.3d at 1106 (internal quotations omitted). To obtain a reduction in sentence due to sentencing entrapment, Jose must show that he "had neither the intent nor the resources for completing" the crime. *United States v. Naranjo*, 52 F.3d 245, 250 & n. 13 (9th Cir.1995) ("In making a sentencing entrapment claim, the burden is on the defendant to demonstrate both the lack of intent to produce and the lack of the capability to produce the quantity of drugs at issue.").

The district court found that Jose was predisposed to sell in amounts up to whatever he could handle, including the 233–gram sale, and was a ready and willing participant in every controlled buy. To the extent that Jose testified that he was reluctant to sell the heroin, the district court found him not credible.

We conclude that the district court applied the correct legal standard by considering Jose's predisposition and capacity to commit the larger heroin sale. *See Naranjo*, 52 F.3d at 250.

## II. Mario Vega

### A. Motion to Suppress

Mario contends that the district court erred by denying his motion to suppress the heroin found in the back seat of his car inside a windshield wiper blade motor. We disagree.

We review de novo the denial of a motion to suppress evidence. *United States v. Hall*, 974 F.2d 1201, 1204 (9th Cir.1992). We also "review de novo the district court's ultimate finding of reasonable suspicion or probable cause supporting a search or seizure." *United States v. Rojas–Millan*, 234 F.3d 464, 468 (9th Cir. 2000). Factual findings are reviewed for clear error. *Id.*

The district court correctly denied Mario's suppression motion and held that the stop and search of Mario's car was valid under a number of theories.

■ First, the investigatory stop of Mario's automobile was supported by a reasonable suspicion that Mario committed a traffic infraction–parking his Honda more than 18 inches from the curb in violation of California Vehicle Code ("CVC") § 22502(a). *See United States v. Wallace*, 213 F.3d 1216, 1217–21 (9th Cir. 2000) (reversing district court's suppres-

sion order where vehicle code violation justified stop, regardless of whether stop was pretextual).

 Second, Mario's failure to present a valid driver's license justified the pre-impound inventory search of his Honda. *See* CVC § 12500(a) ("No person shall drive a motor vehicle upon a highway, unless the person then holds a valid driver's license ..."); CVC § 14602.6(a) (providing for arrest, seizure, and impoundment of vehicle for driving without a license); *see also United States v. Chavez–Valenzuela*, 268 F.3d 719, 724 (9th Cir.2001), *as amended,* 279 F.3d 1062 (9th Cir.2002) (stating that police properly checked defendant's license and registration after traffic stop); *United States v. Wanless*, 882 F.2d 1459, 1463 (9th Cir.1989) (stating "it is undisputed that once a vehicle has been impounded, the police may conduct an inventory search"); *Colorado v. Bertine*, 479 U.S. 367, 368–69, 372–73, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987) (holding that officer's search of closed backpack in the car, initiated after arrest, but before the tow truck arrived, was a proper inventory search); *People v. Salcero*, 6 Cal.App.4th 720, 723, 8 Cal. Rptr.2d 578 (1992) (holding that impound was proper given defendant's lack of valid driver's license, and automobile search was proper under inventory policy).

 Third, independent of any traffic violations, the officers had reasonable suspicion to stop and conduct a warrantless search of Mario's Honda for evidence of drug trafficking, given the collective knowledge of the joint task force. *See United States v. Sutton*, 794 F.2d 1415, 1426 (9th Cir.1986) (holding that collective information known by officers justified stop of defendant's vehicle).

 Moreover, under the automobile exception to the warrant requirement, officials need not obtain a warrant to search an automobile when they have probable cause to believe that it contains contraband. *California v. Acevedo*, 500 U.S. 565, 579–80, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991). Here, the officers had probable cause to believe that the Honda contained drugs based on the officers' knowledge that Mario had just provided his brother Jose with a distributor coil containing herein. *See e.g., United States v. Vizcarra–Martinez*, 66 F.3d 1006, 1011–12 (9th Cir.1995) (holding that probable cause existed to conduct warrantless search of defendant's vehicle after he drove into a garage known to contain hydriodic acid).

To the extent that Mario contends that the stop and search of his car constituted a de facto arrest without probable cause, this contention lacks merit. *See United States v. $109,179 in U.S. Currency*, 228 F.3d 1080, 1084–85 (9th Cir.2000).

**B. Admission of Expert Testimony**

 Mario contends that the district court erred by admitting expert testimony concerning the general structure of drug trafficking organizations because the evidence established only that he participated in one drug transaction.

We review for an abuse of discretion the district court's decision balancing the probative value of the evidence against its prejudicial effect under Federal Rule of Evidence 403. *United States v. LeMay*, 260 F.3d 1018, 1024 (9th Cir.2001).

Here, a DEA agent presented testimony regarding the typical structure of drug trafficking operations, that it was "not necessarily" unusual for a supplier to act as a delivery person or courier, and that it was not unusual for a street-level drug dealer to have more than one source of supply.

Even assuming, without deciding, that the agent's opinions should not have been received, any error was harmless. The

testimony that it was "not necessarily unusual" for a supplier to act as a courier was probative of nothing–it may or may not have been unusual. Such testimony is meaningless, and did no harm. Similarly, the opinion that it is not unusual for a street dealer to have more than one supplier was couched so generally as to convey very little. That something is "not unusual" does not mean that something is likely, common, or even that it is usual. Assuming arguendo that the agent should have not been allowed to express these opinions, no harm was done.

## C. Sufficiency of the Evidence

■ Mario contends that there was insufficient evidence to support his conviction for count one—conspiracy to possess with intent to distribute heroin. More specifically, Mario contends that his involvement in a single drug transaction on May 11, 2001 was insufficient to show knowledge of the overall conspiracy. This contention lacks merit.

We review claims of insufficient evidence de novo. *United States v. Antonakeas*, 255 F.3d 714, 723 (9th Cir.2001). However, the standard of review is "highly deferential," and the court will affirm if after viewing the evidence in the light most favorable to the prosecution, *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Rubio–Villareal*, 967 F.2d 294, 296 (9th Cir.1992) (en banc) (internal quotation marks omitted).

In order to prove conspiracy under 21 U.S.C. § 846, the government must prove an agreement to commit a crime and the defendant's knowledge of the conspiracy's objective and intent to further it. *United States v. Gil*, 58 F.3d 1414, 1423 & n. 5 (9th Cir.1995). A defendant may join "a conspiracy already formed and in existence, and be bound by all that has gone

before in the conspiracy, even if unknown to him." *United States v. Umagat*, 998 F.2d 770, 772 (9th Cir.1993) (internal quotation marks omitted). Moreover, a conspiracy may be based on the commission of a single crime. *Id.* at 774.

Here, the indictment charged Mario with conspiring to possess with intent to distribute in excess of 100 grams of heroin. Mario concedes the existence of a drug conspiracy, and does not challenge the sufficiency of the evidence supporting the substantive count of distributing 233 grams of heroin. Therefore, Mario cannot logically contend that his actions during the final sale on May 11, 2001 did not fall within the scope of an agreement to possess with intent to distribute in excess of 100 grams of heroin. *See id.* at 775 (affirming conspiracy conviction of defendant who was only involved in the final transaction, based on his critical role at the core of the conspiracy).

Based on Mario's critical role in the final transaction, any rational juror could conclude that Mario agreed to possess with intent to distribute in excess of 100 grams of heroin.

**AFFIRMED.**